UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TIMOTHY VAUGHN BROWNELL,

               Petitioner,               Case No. 1:10-cv-544

v.                                                         Honorable Robert J. Jonker

MARY BERGHUIS,

               Respondent.
_____/

## **OPINION**

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Promptly after the filing of a petition for habeas corpus, the Court must undertake a preliminary review of the petition to determine whether "it plainly appears from the face of the petition and any exhibits annexed to it that the petitioner is not entitled to relief in the district court." Rule 4, RULES GOVERNING § 2254 CASES; *see* 28 U.S.C. § 2243. If so, the petition must be summarily dismissed. Rule 4; *see Allen v. Perini*, 424 F.2d 134, 141 (6th Cir. 1970) (district court has the duty to "screen out" petitions that lack merit on their face). A dismissal under Rule 4 includes those petitions which raise legally frivolous claims, as well as those containing factual allegations that are palpably incredible or false. *Carson v. Burke*, 178 F.3d 434, 436-37 (6th Cir. 1999). After undertaking the review required by Rule 4, the Court concludes that the petition must be dismissed because it fails to raise a meritorious federal claim.

**Factual Background**

Petitioner was convicted in the Calhoun County Circuit Court of two counts of first-degree murder, MICH. COMP. LAWS § 750.316;[1] first-degree home invasion, MICH. COMP. LAWS § 750.110a(2); third-degree fleeing and eluding, MICH. COMP. LAWS § 257.602a(3)(b); and four counts of possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b. On July 13, 2007, the trial court sentenced Petitioner to life imprisonment for each of the murder convictions, 95 to 240 months for the home invasion conviction, 23 to 60 months for the fleeing and eluding conviction and two years for each of the felony-firearm convictions.

Petitioner's convictions arise from the murders of his ex-wife and her boyfriend. Petitioner's appellate brief provides the following summary of the evidence presented at trial:

> Ms. [Barbara] Wells was living with defendant. They were watching a football game on the day in question and Defendant drank a few beers. In the afternoon, she left to go to the store to get some food for dinner and when she returned a short time later, defendant was gone. He called a short time later and said he was on his way home. She knew there was a shotgun under the bed but did not know if he had taken it. A short time later, she tried to call him on his cell phone, but received no answer. A short time after that (around 7:45 pm), the police arrived. She was aware defendant was having difficulty concerning the visitation of his children and child support. She was also aware defendant was on anti-depressant medication. (II, 30-64).
>
> Mr. [Jerry] Nye lived 'kitty-corner' from 127 Marshall Street. On the day in question, he saw a green van at a stop sign and shortly afterward heard four shots. (II, 65-70).
>
> Mr. [Stuart] Denny also lived in the area. Around 6:45 pm on that day, a neighborhood girl came over to his house and asked him to call 911 because two people had been shot. He dialed and the girl (Amber) talked to dispatch. He

---

[1] Petitioner was charged with open murder, but prosecuted under alternative theories of first-degree premeditated murder, MICH. COMP. LAWS § 750.316(1)(a), and felony-murder, MICH. COMP. LAWS § 750.316(1)(b). The jury convicted Petitioner under both theories. At sentencing, the trial court clarified that the sentence should reflect first-degree murder supported by two theories.

remained with her until the police arrived approximately 20 minutes later. She also remained on the phone until the police arrived. (II, 71-90).

Ms. Amber Brownell, defendant's daughter, was living with her mother, Mary. Mr. Allen was her mother's boyfriend. On the day in question, defendant called shortly before 6:00 pm and then called two more times. On the last call, she took the phone to her mother, who was in the basement. She went upstairs and a short time later saw a green van go by and she thought it was defendant. She saw it go by a couple more times, went out and stopped it, and talked to defendant. She thought he looked like he had been crying, and had been drinking. She thought he also looked mad. As she ran back up the driveway, she saw him seated in the van. When she got to the side door of the house, she saw defendant get out of the van; beer cans also fell out. She saw defendant get a gun out of the van and rack it. He pointed it at her. She went into the house, told her mother in the kitchen that defendant was there and had a gun and was drunk. Mr. Allen was watching television. Her mother told her to call 911 and as she was trying to do so, she heard Mr. Allen say 'What are you doing here?', then heard what sounded like a door slamming. She then heard crackling, like a door had been kicked in. She ran into a bedroom, heard a gunshot, jumped out of the window, heard another gunshot, and then heard another gunshot just before she got to the neighbor's house. She also heard her mother screaming just before the first shot. She ran to the neighbor's house where she called 911. She admitted she was currently on medication to calm her down. She admitted she had stayed with defendant over the summer for about six weeks, that he would drink, and she thought he was always mad about something. She recalled one incident where they got into a fight and the police were called. She recalled when she talked to her father that day in the van, he indicated he wanted to see his kids and she told him it was none of his business, that he had written them off with a check for child support. (II, 91-149).

Mr. Ronald Jackson was defendant's stepfather. He learned defendant might be in trouble and called him on his cell phone. Defendant indicated he had killed them, that he took care of the problem. He thought from the conversation, defendant was drunk. Defendant indicated he was going to kill himself. He thought defendant had a good relationship with his children. He was aware defendant was a heavy drinker, that he had handed the phone to his wife, who later relayed information that the police were near him. (II, 149-159).

Ms. Connie Jackson, defendant's biological mother, also talked to defendant. He told her the police were behind him, that he had killed them, and that he was going to kill himself. She thought that he sounded upset, drunk, and crazy. He kept talking about his children. She was aware he was having problems visiting them. (II, 160-172).

Mr. Donald Brownell, defendant's adopted father, also received a phone call from defendant, who admitted he killed them, that he had shot them and was on his way to his biological father's boat, then indicated he was going to his stepmother's grave. He did not think defendant was intoxicated but thought he was excited. (II, 172-183).

Officer [Patrick] Johnson responded to the residence. Other offices were present. He saw Ms. Brownell on the floor in the hallway and Mr. Allen at the bottom of the steps from the upstairs to the basement. He was present when the paramedics arrived. (II, 184-199).

State Trooper Annette Poehlman talked to Mr. Denny as well as Amber. With great difficulty, she was able to escort her to the patrol vehicle. Amber was interviewed twice. There was no indication defendant ever entered the house. (II, 201-213).

Paramedic Harmer of the Marshall Area Firefighter and Ambulance Authority responded to the location with his partner. After determining both were dead, he contacted the hospital and established a time of death. (II, 214-220).

Mr. [Brian] Fuller, also worked for the Marshall Area Firefighter and Ambulance Authority. He and his partner responded to a local cemetery for possible treatment in response to a shot being fired. Defendant was treated for two injuries to his chest, which appeared to be inflicted from a firearm. Defendant did not want to be treated. He was unable to determine if defendant was intoxicated but he was handcuffed behind his back. (II, 221-228).

Ms. [Kimberly] Meyer treated defendant at the cemetery. She drove him to the hospital. She did not smell any alcohol on him. She agreed she did not tell the detective that when she was interviewed. (II, 229-233).

Officer [Troy] DeKryger was on patrol when he was informed to be on the lookout for defendant. Based on a tip, defendant was located at a cemetery. He was in a fully marked police vehicle. He pursued defendant for a couple of minutes, located him three blocks from the cemetery, and gave chase, which was video-recorded. He was unable to identify defendant. The video was played for they jury. (II, 235-242).

Officer [Kandyce] Tabeling, also assisted in [the] chase and detention of defendant. Upon learning he had shot himself she attempted to treat him. She indicated she heard defendant indicate that he wanted to die, that in response to a question about why, defendant indicated why would you want to live, that he killed two people and he was going to prison. (III, 5-18).

Deputy Sheriff [Chuck] Saulsberry preserved the scene at the house. (III, 18-24).

Deputy Sheriff [Jeff] Edwards was also at the house. He also was at the cemetery; another officer was attempting to talk to the person in the van when he heard a shot. Defendant exited the vehicle, put his hands up and indicated he was done. After defendant was handcuffed, he secured a shotgun from inside the vehicle. It was later removed from the trunk of his patrol car by another officer. He later retrieved defendant's clothing from the hospital, as well [as] other items from the autopsy. At the cemetery he did not smell any alcohol on defendant nor did he appear intoxicated. He recalled when defendant was checked, some shell casings were removed from his pockets. (III, 25-65).

Trooper [Gerald] Yott interviewed several individuals at the house. He went to the cemetery with Sheriff Edwards. He transported Deputy Edwards to the hospital. He saw the weapon in the trunk. (III, 66-73).

Sheriff Captain [Matthew] Saxton was at the cemetery. He heard a shot from the vehicle other officers had surrounded, assisted other officers in removing defendant from the vehicle and provid[ed] him with first aid. Defendant indicated he did not want any treatment, that he admitted two [sic] just killing two people. He could smell alcohol from defendant. (III, 74-79).

Sheriff [Chris] Mandoka responded to the house, then went to the cemetery where he took up a position with the other officers around the van. He saw defendant drink what appeared to be a beer, saw a gun sweep across defendant's body and heard a shot. Defendant was ordered out of the vehicle; the drover's door opened and he fell out. Several officers surrounded defendant, he saw the weapon in the vehicle and notified other officers. He requested a search warrant for defendant's residence which was executed, seizing several items including a cell phone, divorce decree, and boxes of shotgun shells. (III, 80-91).

Trooper [John] Hofmeister, responded to a [sic] defendant's residence, contacted Ms. Wells. A check of the house revealed a gun case open on the bed as well as an ammunition box. (III, 92-100).

Trooper [Michael] Behrendt went to defendant's residence with Trooper Hofmeister. (III, 101-106).

Sheriff Sergeant [Steve] Watson received information concerning defendant. He joined in the pursuit, arriving at the cemetery and talked to Trooper Tabeling. He heard a shot, saw the driver side window explode. Defendant exited and was arrested. He requested Deputy Edwards [to] secure the weapon from the vehicle. He

later retrieved it from him. Subsequently a spent shell was later [sic] retrieved from the trunk. A search of the van revealed several empty beer cans as well as full ones. Shotgun shells were also found in the van. (III, 108-131).

Mr. [Reinhart] Pope, expert in the area of firearms and tool marks identification, responded to the house, collected various items of evidence, including spent shell casings, plastic shotgun wads from inside the house. He determined the recovered shotgun had fired the shotgun shells. He believed the shell's [sic] contained #6 birdshot. He also indicated there was firearm damage to a door of the house. There was no indication the door had been kicked in. (III, 132-170).

Outside the presence of the jury, defense objected to the court's denial of defendant calling a doctor who examined defendant relative to an interview concerning defendant's competency and responsibility. (III, 170-178).

Dr. [Brian] Hunter, forensic pathologist, performed the autopsies. He determined the cause of death as to Ms. Brownell to be multiple gunshot wounds, one a close range firing; as to Mr. Allen, also multiple gunshot wounds, one being fired through possibly a door. (IV, 4-56).

Detective [Guy] Picketts, lead detective, arrived at the residence, was briefed, viewed the scene, and also received information from defendant's mother. He later went to the hospital where defendant was being tended to and overheard a conversation he had with the nurse. He also interviewed several other witnesses, including Ms. Wells, and received possible evidence. (IV, 56-70).

Prosecution rested, as did defense. (IV, 72-73).

(Def.-App. Br. on Appeal, Page ID#29-34.)

Following closing arguments, the trial court instructed the jury and dismissed them to deliberate. The trial court gave the standard jury instruction for first-degree premeditated murder, CJI2d 16.1. During deliberations, the jury sent the following question to the trial judge, "Is premeditation days [sic] only at the onset of a crime or can the crime be in process, then premeditation come[s] into play[?]" (V, 3). Over defense counsel's objection, the trial court instructed the jury, "Yes, premeditation could be formulated in one's mind in the process of the criminal transaction or at the onset." Defense counsel recommended that the trial court simply

re-read the first-degree premeditated murder instruction. Counsel objected to the court's expansion of the jury instruction by adding a definition or adding a clarification to which may not have been meant. (V, 3-4.) The jury returned a verdict within ten minutes, finding Defendant guilty of both premeditated first-degree murder and first-degree felony murder, first-degree home invasion, fleeing and eluding and the related felony-firearm charges.

Petitioner appealed as of right to the Michigan Court of Appeals raising one claim that the trial court gave an improper supplemental instruction on premeditation. In an unpublished opinion issued on June 16, 2009, the Michigan Court of Appeals affirmed Petitioner's conviction. Petitioner presented the same claim in his application for leave to appeal in the Michigan Supreme Court. The supreme court denied his application on October 26, 2009. Petitioner now raises the same claim in his application for habeas corpus relief.

## **Standard of Review**

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003). A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

**Discussion**

In his application for habeas corpus relief, Petitioner contends that he was denied a fair trial when the trial court instructed the jury in response to their question that premeditation could be formulated in the process of the criminal transaction. Petitioner argues that the trial court should only have repeated the standard jury instruction for first-degree premeditated murder and that by telling the jury that premeditation could be formulated during the process of a criminal transaction, the court "effectively removed from the trier of fact any consideration that defendant did not have the time to think beforehand the consequences of his actions." (Def.-App. Br. on Appeal, Page ID#38.) The Michigan Court of Appeals rejected Petitioner's claim, stating:

> To convict a defendant of first-degree murder, the prosecutor must prove that the defendant intentionally killed the victim and that the killing was premeditated and deliberate. *People v Marsack*, 231 Mich App 364, 370; 586 NW2d 234 (1998). "Premeditation and deliberation require sufficient time to allow the defendant to take a second look." *Id.* at 370-371. Proof of the elements may be satisfied by circumstantial evidence and reasonable inferences drawn from the evidence. *Id.* at 371. A specific time requirement is not imposed. *People v Plummer*, 229 Mich App 293, 300; 581 NW2d 753 (1998). Factors that may be considered to establish premeditation include: (1) the prior relationship between the defendant and the victims; (2) the defendant's actions before and after the crime; and (3) the circumstances surrounding the killing, including the weapon used and the location of the wounds inflicted. *Id.* at 300-301. A pause between the initial homicidal intent and the ultimate crime may be sufficient to establish premeditation. The critical inquiry is whether the defendant had the time to premeditate and the capacity to do so. *Id.* at 301-302.
>
> We review claims of instructional error de novo. *People v McGhee*, 268 Mich App 600, 606; 709 NW2d 595 (2005). "At a criminal trial, the judge functions both as a neutral arbiter between the two contesting parties and as the jury's guide to the law. This role requires that the judge instruct the jury regarding the law applicable to the case . . . and fully and fairly present the case to the jury in an understandable manner." *People v Moore*, 189 Mich App 315, 319; 472 NW2d 1 (1991) (internal citations omitted). "Instructions are read as a whole rather than extracted piecemeal to determine whether error requiring reversal occurred." *McGhee, supra*. "Even if somewhat imperfect, there is no error if the instructions fairly presented the issues to be tried and sufficiently protected the defendant's rights." *People v Wolford*, 189

Mich App 478, 481; 473 NW2d 767 (1991). When the jury requests a supplemental instruction on a specific area, the trial judge is not obligated to give the instructions previously given. *People v Katt*, 248 Mich App 282, 311; 639 NW2d 815 (2001). The trial judge need only respond to the instruction requested. *Id.* The supplemental instruction is proper if responsive to the jury's request and does not serve to mislead the jury in any manner. *Id.* Jurors are presumed to follow the instructions given by the trial court. *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998).

In the present case, defendant contends, without citation to authority, that the supplemental instruction was improper because it "effectively removed from the trier of fact any consideration that defendant did not have time to think about beforehand the consequences of his actions." The instruction as given by the trial judge acknowledged that premeditation may occur at different periods during a criminal process or at the commencement. The instruction did not foreclose from the jury's consideration that defendant's mindset may have changed at different periods during the thirty minute drive to the ex-wife's residence. We cannot conclude that the supplemental instruction was improper where it responded to the jury's request, did not mislead the jury, and reflected the circumstances and factors underlying premeditation. *Katt, supra*; *Marsack, supra*.3

> 2 Although defendant does not challenge the elements of felony-murder, the alternative theory of conviction, we nonetheless will address the merits of the claim of appeal.
>
> 3 For purposes of completeness, we note that there was ample evidence that defendant had the opportunity to take a "second look" in light of the lengthy drive to the residence and the conversation with his daughter prior to the actual shooting. *Marsack, supra*; *Plummer, supra*.

(MCOA Op., Page ID#18-19.)

Typically, a claim that a trial court gave an improper jury instruction is not cognizable on habeas review. Instead, Petitioner must show that the erroneous instruction "so infected the entire trial that the resulting conviction violates due process." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). *See also Estelle v. McGuire*, 502 U.S. 62, 75 (1991) (erroneous jury instructions may not serve as the basis for habeas relief unless they have "so infused the trial with unfairness as to deny due process of law"); *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000) (same). If Petitioner fails to meet this burden, he fails to show that the jury instructions were contrary to federal law. *Id.*

Petitioner cannot meet this difficult standard. The trial court's supplemental instruction that "premeditation could be formulated in one's mind in the process of the criminal transaction or at the onset,"was consistent with Michigan law. As discussed by the Michigan Court of Appeals, there is no specific time requirement for premeditation. *See People v. Plummer*, 581 N.W. 2d 753, 757 (Mich. Ct. App. 1998). Premeditation requires only a pause between the initial homicidal intent and the murder, *id.*, and, thus, could be formed before or during the course of the criminal transaction. Moreover, there was ample evidence supporting a finding of premeditation in this case. The evidence showed that Petitioner had a child visitation dispute with his ex-wife, that he took a shotgun with him to his ex-wife's home and entered her home without permission before shooting his ex-wife and her boyfriend. Furthermore, the trial court's supplemental instruction in response to the jury's question did not negate the trial court's earlier instructions on first-degree premeditated murder. Even if the trial court had given an erroneous instruction on premeditation, Petitioner also was convicted of first-degree murder under alternative felony-murder theory. Petitioner does not challenge his conviction under the felony-murder theory. Consequently, he cannot establish a violation his due process rights arising from the jury instructions.

## Conclusion

In light of the foregoing, the Court will summarily dismiss Petitioner's application pursuant to Rule 4 because it fails to raise a meritorious federal claim.

## Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This Court's

dismissal of Petitioner's action under Rule 4 of the Rules Governing § 2254 Cases is a determination that the habeas action, on its face, lacks sufficient merit to warrant service. It would be highly unlikely for this Court to grant a certificate, thus indicating to the Sixth Circuit Court of Appeals that an issue merits review, when the Court has already determined that the action is so lacking in merit that service is not warranted. *See Love v. Butler*, 952 F.2d 10 (1st Cir. 1991) (it is "somewhat anomalous" for the court to summarily dismiss under Rule 4 and grant a certificate); *Hendricks v. Vasquez*, 908 F.2d 490 (9th Cir. 1990) (requiring reversal where court summarily dismissed under Rule 4 but granted certificate); *Dory v. Comm'r of Corr. of the State of New York*, 865 F.2d 44, 46 (2d Cir. 1989) (it was "intrinsically contradictory" to grant a certificate when habeas action does not warrant service under Rule 4); *Williams v. Kullman*, 722 F.2d 1048, 1050 n.1 (2d Cir. 1983) (issuing certificate would be inconsistent with a summary dismissal).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* at 467. Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322,

327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability.

A Judgment and Order consistent with this Opinion will be entered.


Dated:     July 7, 2010              /s/ Robert J. Jonker
                                    ROBERT J. JONKER
                                    UNITED STATES DISTRICT JUDGE